IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

INTELLECTUAL VENTURES I LLC, *et al.*,   §
                                          §
vs.                                       §   CIVIL ACTION NO.  6:15-CV-660
                                          §
HCC INSURANCE HOLDINGS, INC., *et al.*    §

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This report and recommendation construes the disputed claim terms in United States Patent Nos. 6,516,442 ("the '442 Patent"), 7,516,177 ("the '177 Patent"), 7,757,298 ("the '298 Patent"), and 7,949,752 ("the '752 Patent"), asserted in this suit by Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively "IV").  The Parties' claim construction briefing also addresses Defendants' indefiniteness arguments.

On June 15, 2016, the Parties presented oral arguments on the disputed claim terms at a *Markman* hearing.  Based on the analysis stated herein, the Court resolves the Parties' claim construction disputes and **RECOMMENDS** the constructions set forth below.

## BACKGROUND

Intellectual Ventures filed the above-styled action against Defendants HCC Insurance Holdings, Inc., HCC Life Insurance Company, HCC Specialty Insurance Company, HCC Specialty Underwriters, Inc., Houston Casualty Company, and Professional Indemnity Agency, Inc.'s (collectively "HCC") alleging infringement of the asserted patents.  *See* Docket No. 1. There are two separate but related actions pending before the Court involving claims of patent infringement of the '177 Patent, and one action pending involving claims of patent infringement of the '442 Patent.  Docket No. 31 at  ¶ 7; *see also Intellectual Ventures II LLC v. Bitco General*

*Insurance Corporation*, 6:15-CV-59; *Intellectual Ventures II LLC v. Great West Casualty Company*, 6:15-CV-60;[1] *Intellectual Ventures II LLC v. Kemper Corp., et al*., 6:16-CV-81.

## APPLICABLE LAW

### Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312–13; 3 *Bell Atl. Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and un-asserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517

---

[1] On April 30, 2015, cause nos. 6:15-CV-59 and 6:15-CV-60 were consolidated for pretrial issues only, with the exception of venue. *See Intellectual Ventures II LLC v. Bitco General Insurance Corporation*, 6:15-CV-59, Docket No. 33.

U.S. 370, 116 S.Ct. 1384, 134 Led.2d 577 (1996)).   "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"   *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).   In the specification a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.   *Phillips*, 415 F.3d at 1316.   Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.   *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).   This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and 4 accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."   *Teleflex, Inc.*, 299 F.3d at 1325.   For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct."   *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583).   But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims."   *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent.   *Home*

*Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent").   The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."   *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).   The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance.   *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted).   "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover."   *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (quotation omitted).   "As a basic principle of claim interpretation, 5 prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art."   *Phillips*, 415 F.3d at 1317 (quotation omitted).   Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how the term is used in the patent.   *Id.* at 1318.   Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim

term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

### Claim Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. "[I]ndefiniteness is a question of law and in effect part of 7 claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007). The definiteness standard of 35 U.S.C. § 112, ¶ 2 requires that:

> [A] patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter."

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129–30 (2014) (internal citations omitted).

### ANALYSIS

### I.   Agreed Terms

The Parties have submitted the following agreements:

| Term | Agreed Construction |
|------|---------------------|
| "administrative interface" ('177 Patent, Claim 11) | A software management tool that facilitates administrative functions. |
| "centralized access point of a user" ('177 Patent, Claims 11 and 16) | A user's network resource that can be used to access content. |
| "centralized access point of the particular user" ('177 Patent, Claim 16) | The particular user's network resource that can be used to access content. |
| "distributed information access point" ('177 Patent, Claims 11 and 16) | A network resource which is delivered to one or more users and that enables a user to interact with a centralized access point. |

| | |
|---|---|
| "identification value"<br>('298 Patent, Claims 1, 10, and 16) | A value used to identify a file. |
| "checksum"<br>('298 Patent, Claims 3 and 10) | A unique number based upon a range or ranges of bytes in a file, but not related to the total number of bytes used to generate the number |
| "means for receiving data for creating a network based agent"<br>('752 Patent, Claim 1) | Function: receiving data for creating a network based agent<br><br>Structure: communication line 68 |
| "means for invoking, in response to receiving a URL defining a type of event and identifying the network-based agent, an execution of the network-based agent"<br>('752 Patent, Claim 1) | Function: invoking, in response to receiving a URL defining a type of event and identifying the network-based agent, an execution of the network-based agent<br><br>Structure: agent server 20 |
| "means, including the network-based agent, for using a service and a service resource configured to be consumed by the network-based agent for performing the operation, wherein an amount of the service resource is exhausted upon being consumed by the network-based agent"[2]<br>('752 Patent, Claim 1) | Function: using a service and a service resource configured to be consume by the network-based agent for performing the operation, wherein an amount of the service resource is exhausted upon being consumed by the network-based agent<br><br>Structure: agent 22 |
| "means for communicating a result of the operation over a network communications link"<br>('752 Patent, Claim 6) | Function: communicating a result of the operation over a network communications link<br><br>Structure: communication line 68 |
| "means for allowing a user to modify the network-based agent"<br>('752 Patent, Claim 6) | Function: allowing a user to modify the network-based agent<br><br>Structure: network system 2 |

Docket No. 66-1 at 1-2.  In light of the Parties' agreements on these terms, the Court hereby

**RECOMMENDS** these proposed constructions.

---

[2] Intellectual Ventures agrees that the HCC's indefiniteness challenge to the term "service resource" applies to this means-plus function term because the function includes the term "service resource." HCC agrees that, while the phrase "and equivalents" is not included in the corresponding structure for any of these means-plus-function terms, IV is entitled to equivalents under 35 U.S.C. § 112 ¶ 6 to the extent such theories are timely disclosed.

## II.     *Disputed Terms in the '442 Patent*

The '442 Patent, titled "Channel Interface and Protocols for Cache Coherency in a Scalable Symmetric Multiprocessor System," was filed on March 30, 1999, and issued on February 4, 2003.  The Abstract states:

> A preferred embodiment of a symmetric multiprocessor system includes a switched fabric (switch matrix) for data transfers that provides multiple concurrent buses that enable greatly increased bandwidth between processors and shared memory. A high-speed point-to-point Channel couples command initiators and memory with the switch matrix and with I/O subsystems. Each end of a channel is connected to a Channel Interface Block (CIB). The CIB presents a logical interface to the Channel, providing a communication path to and from a CIB in another IC. CIB logic presents a similar interface between the CIB and the core-logic and between the CIB and the Channel transceivers. A channel transport protocol is is [sic] implemented in the CIB to reliably transfer data from one chip to another in the face of errors and limited buffering.

### a. "error correction" (Claims 1 and 24)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | "using a code to reconstruct data received with an error" |

The Parties dispute whether the term "error correction" requires using a code for the correction of erroneous data.  The Parties agree that "error correction" is reconstruction of erroneous data.  Docket No. 75 at 14, *see also* Tr. at 60:3-9.  IV, however, argues that the plain language of the claim does not limit the term to the use of "codes" to correct such erroneous data.  *Id.*  IV further argues that dependent claims 2 and 25 expressly require an "error correction code," while claims 1 and 24 do not. *Id.*  Claim 2 recites interfaces that are "configured to add error correction codes to the packets being transferred over the channels to check the error correction codes in the packets . . . ."  '442 Patent at claim 2.  Similarly, claim 25 requires "adding error correction codes to the packets being transferred over the channels; [and] checking the error correction in the packets being received over the channels . . . ."  '442 Patent at claim

25.  IV argues that the use of "error correction" in claims 1 and 24—without the word "code"—strongly implies that not all "error correction" includes codes, and further indicates that an error correction "code" requirement should not be read into the independent claim limitation when that requirement is expressly added in dependent claims. Docket No. 75 at 15.

HCC responds that neither IV nor the '442 Patent explain how data can be reconstructed absent the use of a code.  Docket No. 78 at 19.  According to HCC, each packet includes an error correction code ("ECC")—"the 8-bit ECC field transmitted with every packet." *Id.* (citing '442 Patent at 21:7-8).  HCC further argues that the examiner allowed the claims over prior art that disclosed error correction that uses a code.  *Id.*  HCC also contends that claim 1 requires an error correction code, and thus claim 2 does not add this limitation but instead specifies where the code is added (*i.e.*, the interfaces).  *Id.* at 20.  Finally, HCC argues that claim 2 is not performing "error correction" at all, as indicated by the recited "retry request," appearing at the end of claim 2.  *Id.*  According to HCC, if the error is corrected (*i.e.*, if the original data is reconstructed), then there is no need for a retry request.  *Id.*

Claims 1 and 24 require that an "error correction" must occur, but do not restrict it to one type of error correction.  Moreover, it would be improper in this instance to limit the claims to the embodiment disclosed in the '442 Patent.  The patentee knew how to claim error correction codes, and declined to do so for claims 1 and 24.  Claim 25 expressly adds, "adding error correction codes to the packets being transferred over the packets," and "checking the error corrections codes in the packets." Such limitations are absent from claims 1 and 24, which implies that "error correction codes" are not required in those claims.  Finally, claim 1 expressly recites that the interfaces "perform error correction of the data in the packets over the channels." '442 Patent at Claim 1.  Thus, contrary to HCC's contention, claim 2, which depends on claim 1,

includes the limitation of performing error correction.  Section 112. 35 U.S.C. § 112(d) ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").  As indicated above, the Parties agree that "error correction" is at least the reconstruction of erroneous data.  Docket No. 75 at 14, *see also* Tr. at 60:3-9.  Accordingly, the Court construes the term "error correction" to mean "reconstruction of erroneous data."

      **b. "error correction code" (Claims 2 and 25)**

| IV's Proposed Construction | HCC's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning.  No construction necessary. | "a code that can be used to reconstruct data received with certain numbers of bit errors without requiring a retransmission of the data" |

The Parties dispute whether the term "error correction code" is limited to a code that: (1) reconstructs data received with certain numbers of bit errors; and (2) does not require retransmission of the data.  IV contends that nothing in the claim language limits that code to one that is used in a specific error correction process. Docket No. 75 at 12.  IV argues that a person of ordinary skill in the art would know from the intrinsic record that the patentee used and applied the ordinary and customary meaning of "error correction code"—a code that can be used to correct erroneous data.  *Id.* at 13.  IV agrees that an embodiment in the '442 Patent discloses that the system can employ an error correction code to correct single-bit errors, but argues that the claims are not limited to that embodiment.  *Id.* (citing '442 Patent at 16:52–55).

IV further argues that the specification does not limit the error correction process, let alone the code, to one that does not require retransmission of the data.  *Id.*  IV also argues that relevant technical dictionaries do not restrict an "error correction code" to a certain number of bit errors or require a lack of "retransmission."  *Id.*  IV further points the Court to an *Inter Partes* Review ("IPR") in which the petitioner argued that "[t]he broadest reasonable construction of 'error correction code,' in the context of the 442 patent specification and claims, is 'a code that

can be used to correct erroneous data.'" IV contends that this support their position that no construction of the term is necessary.

HCC responds that the specification highlights that "error correction" (in which the original data is reconstructed) is different from "retry" (in which the original data is retransmitted).  Docket No. 78 at 17 (citing '442 Patent at 15:42-45).  HCC argues that the specification also highlights that error correction is different from error detection.  *Id.* (citing '442 Patent at 16:50-55).  According to HCC, the specification indicates that if error correction occurs, then no retry is needed, but because only error detection (rather than error correction) is performed, a retry is needed when an error is detected.  *Id.* at 18.

HCC further argues that the extrinsic evidence indicates that error detection, unlike error correction, cannot reconstruct the original data, and thus the data must be resent if it is ever to be received without any errors.  *Id.*  HCC contends that error correction uses a code (an "encoding") to "reconstruct the original data."  *Id.*  HCC also argues that the specification indicates that the errors in question are bit errors, and the error correction coding (if used for that purpose) can correct only certain numbers of errors depending on the coding that is used ("single bit error correction" in the example).  *Id.* (citing '442 Patent at 16:52-55).  Finally, HCC contends that the specification indicates that the word "instead" shows that a "retry" is needed only when either error correction is not used, or error correction is unsuccessful (*e.g.*, if there was more than just a single bit error).  *Id.* at 19 (citing '442 Patent at 16:52-55).

Overall, in view of the patentee's use of the term, "error correction code" must be construed as a "code that can be used to correct erroneous data."  The specification states that "[t]he Channel transport protocol sends and receives 80 bits each cycle through the Channel transceiver interface," and that "[t]he transport protocol internally deals with 64 data bits, 8 error

detection bits, and 8 control bits." '442 Patent at 15:46-51.  The specification further states that "[a]lthough the error detection code actually does provide information for single bit error correction, this is not used for Channel data."  *Id.* at 16:53-56.  Similarly, in describing the CIB Receive Logic, the specification states that "[d]ata from the Channel is synchronous with the core clock, and all 80 bits are available at once."  *Id.* at 19:41-41.  Likewise, the specification states "[a] packet can be received with bad ECC (as detected by the 8-bit ECC field *transmitted with every packet*)."  *Id.* at 21:6-8 (emphasis added).  Accordingly, the intrinsic evidence indicates that the recited "error correction code" is code that can be used to correct erroneous data.

However, the term "error correction code" should not be construed to include "without requiring a retransmission of the data."  The intrinsic evidence does not require reading this limitation into the disputed term.  Indeed, the specification states that "[t]he data must be ECC-checked," and that "[d]ata packets with ECC errors will not be put in to the receive FIFO. ECC error detection will put the CIB logic in 'error retry' mode."  *Id.* at 19:42-56.  HCC argues that the patent includes an embodiment in which an error correction code is not used for error correction, but is instead used only for error detection.  Docket No. 78 at 17 (citing '442 Patent at 16:50-55).  HCC contends that if error correction had occurred, then no retry would have been needed.  *Id.* at 18.  However, the claims are not limited to this embodiment, and the intrinsic evidence does not exclude a scenario where both error correction and retransmission has occurred.  Indeed, the specification states that "uncorrectable" errors may include "those that fail any error correction and/or retry."  '442 Patent at 15:44-45.  Accordingly, the Court construes the term "error correction code" to mean a "code that can be used to correct erroneous data."

### c. "packet" (Claims 1 and 24)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | "a basic unit of transport over a channel including a header, a payload, and an error correction code" |

The Parties dispute whether the term "packet" requires an "error correction code," as HCC proposes.  IV contends that the '442 Patent defines the term "packet" as "a basic unit of transport over the [c]hannel." Docket No. 75 at 20 (citing '442 Patent at 6:53–54).  IV agrees that the '442 Patent provides an example packet from a "preferred embodiment" that includes underlying data, control information (e.g., a header), and an error correction code.  *Id.* (citing '442 Patent at 6:54–60).  IV contends, however, that this preferred embodiment should not be read into the claims.  *Id.*  Finally, IV argues that extrinsic evidence discloses that a packet is a "group of binary digits including data control elements which is switched and transmitted as a composite whole. The data and control elements and possibly error control information are arranged in a specified format." *Id.* (citing Docket No. 75-2 at 5).  IV contends that this further indicates that a "packet" may include an error correction code, but a code is not required.  *Id.*

HCC contends that the preferred embodiment indicates that the packet is "a single 80-bit frame" with 64 bits of data, 8 bits of control information, and an 8 bit error correction code. Thus, HCC argues, "[w]hile the specific bit counts may vary among claimed embodiments, the presence of a header, a payload, and an error correction code may not – each of these components must be present in every claimed embodiment of the asserted claims."  Docket No. 78 at 21. HCC further argues that the '442 Patent fails to describe any way in which to provide the required code absent an error correction code in the packets.  *Id.*

The intrinsic evidence indicates that the recited packet includes "error correction code." The specification states "[a] 'packet' is the basic unit of transport over the Channel."  '442 Patent

at 6:52.  The specification further states that in a preferred embodiment "a packet is a single 80-bit frame (information unit) exchanged between CIBs."  '442 Patent at 6:53-54.  The specification adds that the frame includes data exchanged core-to core, control information, and "8 bits of ECC exchanged CIB-to-CIB." '442 Patent at 6:60; *see also* '442 Patent at 15:49-50 ("The transport protocol internally deals with 64 data bits, 8 error detection bits, and 8 control bits.").  Moreover, claims 1 and 24 of the '442 Patent recite that the interfaces perform "error correction of the data in the packets exchanged over the channels." As indicated, it is the error correction code that is exchanged CIB-to-CIB (*i.e.*, interface-to-interface) that enables the interface to perform the error correction.  Indeed, the specification states "[a] packet can be received with bad ECC (as detected by the 8-bit ECC field *transmitted with every packet*)." '442 Patent at 21:7-8 (emphasis added).

Contrary to IV's contention, requiring the "packet" to include an error correction code is not limiting the claims to the preferred embodiment.  Instead, the "preferred embodiment" is the 80-bit frame (information unit) exchanged between CIBs.  The Court's construction by no means limits the claims to this specific bit count.  However, while the bit count may vary among claimed embodiments, the data, control information, and error correction code must be present in every claimed embodiment to provide the claimed "error correction."  Indeed, the specification states that "the particular connotation for the term packet must be determined from the context in which it is used." '442 Patent at 7:17-19.  Here, the context of the term "packet" is performing error correction of the data in the packets exchanged over the channels.  Therefore, a person of ordinary skill in the art would understand that the recited packet includes error correction code. The extrinsic evidence is consistent with the intrinsic evidence by indicating that a packet may include error control information, which further indicates that context matters.

Regarding dependent claims 2 and 25, the claims not only recite "adding error correction codes to the packets," but also recite "transferring a retry request if one of the packets being received has an error."  This is consistent with the specification's statement that "[a]lthough the error detection code actually does provide information for single bit error correction, this is not used for Channel data.  Instead the data transfer is retried using the transport retry protocol." '442 Patent at 16:53-55.   Thus, dependent claims 2 and 25 are directed to the specific embodiment of checking the error correction code and transferring a retry request if one of the packets has an error.  Contrary to IV's contention, the dependent claims do not indicate that the recited "packet" do not include an error correction code.  Instead, both the independent and dependent claims are consistent with the specification's statement that "[t]he core logic assumes that the CIB does its own error detection and retry so that any 'uncorrectable' errors (those that fail any error correction and/or retry) can be deemed to be system fatal." '442 Patent at 15:43-46. Accordingly, the Court construes the term "packet" as "a basic unit of transport over a channel that includes data, control information, and error correction code."

### d. "transaction controller" (Claims 9 and 10)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | "a central system-serialization and cache coherence point through which all transactions must pass, ensuring that all transactions in the system happen in a defined order, obeying defined rules" |

The Parties dispute whether "transaction controller" should be construed and, if so, whether the construction should rely on how that term is described in the specification.  IV contends that the claims define what the "transaction controller" is and what it must do.  Docket No. 75 at 21.  IV also argues that the specification does not contain any clear disclaimer or definitional statements by describing a preferred embodiment.  *Id.* (citing '442 Patent at 3:66–

4:7).   IV contends that HCC's construction describes the functionality of the transaction controller based on how it "acts," not its structure.  *Id.* at 22.  IV further contends that HCC's reach into the specification to incorporate additional functional requirements to the structure of the "transaction controller" is beyond what is claimed.  *Id.*

HCC responds that a person of ordinary skill in the art would naturally turn to the specification for guidance because "transaction controller" does not have a plain and ordinary meaning, and the specification provides HCC's construction.  Docket No. 78 at 24 (citing '442 Patent at 3:55–4:7).  HCC also argues that the patent specification defines box 400 labeled "Transaction Controller" in Figure 3 simply by specifying what that box does, and such definition is the construction proposed by HCC.  *Id.* at 25.

The intrinsic evidence indicates that the term "transaction controller" should be construed to mean a "system-serialization point through which all transactions must pass."   The specification states that the prior art lacked "an SMP system architecture that provides greater seal ability by permitting concurrent use of multiple buses, while still providing a system serialization point to maintain strong transaction ordering and cache coherency."  '442 Patent at 1:41-45.  The specification adds that "[t]he most critical coherency principle obeyed by the FCU is the concept of a single, system-serialization point. The system-serialization point is the 'funnel' through which all transactions must pass. . . . In the FCU, the system-serialization point is the Transaction Controller (TC)."  *Id.* at 3:55-63.  The specification further states "[a] first key component of the FCU is the Transaction Controller (TC) 400."   *Id.* at 5:27-28.  The specification also states "[a]ll requests, cacheable or not, pass through the Transaction Controller."  *Id.* at 4:2-3.  The specification also adds that "[b]y guaranteeing that all transactions pass through the system-serialization point, a precise order of transactions can be defined."  *Id.* at

3:58-61.  Accordingly, a person of ordinary skill would understand that the recited "transaction controller" is "a system-serialization point through which all transactions pass."

HCC's construction adds limitations to the "transaction controller" beyond what is claimed.  The claim language itself recites certain limitations for the transaction controller, and HCC's proposed construction is redundant of this language.   However, construing the "transaction controller" as "a system-serialization point through which all transactions pass" is not reading a preferred embodiment into the claims.  As discussed above, the specification states that there was a need for a system-serialization point, and that this was the most critical coherency principal.  '442 Patent at 1:41-45, 3:55-63.  The specification further explicitly states that the system-serialization point is the Transaction Controller (TC).  *Id.* at 3:62-63.   The Court's construction takes the context from the specification without HCC's proposed redundant language.  Accordingly, the Court construes the term "transaction controller" to mean "a system-serialization point through which all transactions pass.

### e. "microprocessor interface" (Claims 1 and 24) / "memory interface" (Claims 1 and 24) / "switch interface" (Claims 1 and 24)

| Term | IV's Proposed Construction | HCC's Proposed Construction |
|---|---|---|
| "microprocessor interface" (Claims 1 and 24) | Plain and ordinary meaning. No construction necessary. | The microprocessor interfaces are distinct from the memory interface and the switch interfaces. |
| "memory interface" (Claims 1 and 24) | Plain and ordinary meaning. No construction necessary. | The memory interface is distinct from the microprocessor interfaces and the switch interfaces. |
| "switch interface" (Claims 1 and 24) | Plain and ordinary meaning. No construction necessary. | The switch interfaces are distinct from the microprocessor interfaces and the memory interface. |

The Parties dispute whether the interface terms must be "distinct" from each other.  HCC argues that claim 1 indicates that the different interfaces are different in numerous ways, and that each type of interface is distinct from every other type of interface.  Docket No. 78 at 22.  HCC

further argues that each interface shown in Figure 3 is distinct from every other interface shown in the figure.  *Id.*  Specifically, HCC points to three ways in which the interface terms are different.  *Id.*  First, HCC argues that they are different in number because the switch interfaces and microprocessor interfaces are described in Claim 1 as "a plurality," but Claim 1 recites only a single memory interface.  *Id.*  Second, HCC contends they are different in what they exchange because claim 1 states that the switch interfaces exchange packets, whereas the microprocessor interfaces and the memory interface exchange both data and packets.  *Id.*  Third, HCC argues that they are different in what the communicate with because Claim 1 states that the switch interfaces exchange packets with channels and with the switch fabric, the microprocessor interfaces exchange date with microprocessors and exchange packets with the switch interface, and the memory interface exchanges data with a memory device and exchanges packets with the switch interfaces.  *Id.*

IV replies that the "distinctions" HCC points to—how many interfaces are required, what data is exchanged, and what each interface is connected to—are already detailed in the claim language.  Docket No. 79 at 5.  IV contends that the claimed interfaces may be contained in the same physical structure, and they need not be different physical components.  Docket No. 75 at 16.  IV argues that the specification discloses that various interfaces reside within the same structure (*i.e.*, the flow control unit ("FCU")).  *Id.* (citing '442 Patent at 5:38-41).  According to IV, the "degree of separation" required to meet the claimed "interfaces" limitation is "a question of fact for determining infringement rather than a question of claim construction."  *Id.* at 17 (citing *Cellular Communs. Equip. LLC v. Samsung Elecs. Co.*, No. 6:14-cv-759, 2016 U.S. Dist. LEXIS 42361, at *26 (E.D. Tex. Mar. 29, 2016)).

The intrinsic evidence indicates that the interface terms should be given their plain and ordinary meaning.  The "distinctions" HCC points to (*i.e.*, (1) how many interfaces are required; (2) what data is exchanged; and (3) what each interface is connected to) are already detailed in the claim language.   Further, the specification indicates that the claimed interfaces may be contained in the same physical structure – one chip can have all three interfaces. *See, e.g.*, '442 Patent at 5:38-41 ("Additional key components of the FCU include one or more Initiator Interfaces (IIFs) 3102; a Memory Interface (MIF) 3108; and Channel Interface Blocks (CIBs) 306 at the periphery of the various interfaces."); *see also id.* at Figure 3 (showing various interfaces within same physical structure of the FCU).   Accordingly, having resolved the Parties' claim construction dispute, the interface terms should be given their plain and ordinary meaning.

### f. "in the interfaces" (Claim 24)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | This term is indefinite. |

The Parties originally disputed whether the term "in the interfaces" is indefinite.  HCC argues that "[t]he final element of Claim 24 requires that error correction be performed 'in the interfaces,' but the claim does not specify which of the various interfaces are encompassed by the phrase 'in the interfaces.'"   Docket No. 78 at 23.  However, HCC also argues that "as an alternative to a finding of indefiniteness, Defendants ask the Court to construe 'in the interfaces' to mean 'in the microprocessor interfaces, in the switch interfaces, and in the memory interface.'"  *Id.*  At the *Markman* hearing, HCC confirmed that if the term is construed, it should be construed to mean "in the microprocessor interfaces, in the switch interfaces, and in the memory interface."  *See* Tr. at 94:19-96:5.  Consistent with HCC's proposed construction, IV argues that "[b]ecause claim 24 does not distinguish between which interface does the error

correction of the data in the packets, the only reasonable interpretation is that all of the interfaces must perform error correction."  Docket No. 75 at 19.  Accordingly, and in light of the Parties' agreement, the Court construes the term "in the interfaces" to mean "in the microprocessor interfaces, in the switch interfaces, and in the memory interfaces."

### III.     Disputed Term in the '177 Patent

The '177 Patent, titled "Apparatus for Distributing Content Objects to a Personalized Access Point of a User Over a Network-Based Environment and Method," was filed on June 28, 2004, and issued on April 7, 2009.  The Abstract states:

> An apparatus is provided for distributing content objects to a personalized access point of a user over a network-based environment. The apparatus includes a server, a selection client, and a retrieval client. The server includes a database operative to store indicia associated with at least one content object and further operative to store user identifiers as well as information about which content objects have been selected by a particular user. The selection client communicates with the server via a communication link. The selection client is configured to allow a user to select content objects to add to a personalized access point by submitting an indicia and a user identifier to the server. The retrieval client communicates with the server over a communication link allowing a user to retrieve information from a personalized access point. In response to the submission of the indicia and user identifier, at least one of: (a) a content object, and (b) a link to a content object are added to the personalized access point of the particular user and the particular user can retrieve the content object through the personalized access point from the retrieval client. A method is also provided.

**a. "presenting one or more distributed information access points to one or more potential users at a visually perceptible location" (Claim 16)**

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | This term is indefinite. |

The Parties dispute whether the phrase "presenting one or more distributed information access points to one or more potential users at a visually perceptible location" reasonably inform those of ordinary skill in the art who does and does not qualify as a "potential user."[3]

HCC argues that neither the claims nor the specification of the '177 Patent provide clear guidance about the meaning of "potential users."   However, the definiteness standard of 35 U.S.C. § 112, ¶ 2 requires that:

> [A] patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter."

*Nautilus, Inc.* at 2129–30 (internal citations omitted).   Here, the claim language itself is reasonably certain.   First, claim 16 recites "providing a database . . . capable of storing information about: a) content, and b) users," and "assembling content into one or more distributed information access points which are in communication with the database . . .."   Thus, claim 16 indicates that the content is stored in a database, and that the content is assembled into access points.   Specifically, claim 16 recites, "presenting one or more distributed information access points to one or more potential users."   '177 Patent at Claim 16.   Claim 16 then recites "selection content from one or more of an entire range of distributed information access points for addition to a central access point of the particular user."   *Id.*   HCC contends the claim does not provide any criteria for distinguishing "potential" users from "actual" users, or from any other type of user.   Contrary to HCC's contention, the plain language of claim 16 indicates that

---

[3] IV's opening brief focuses on the word "visually perceptible location" in the disputed phrase.  However, HCC's position, as evident by the Response Brief and argument at the *Markman* hearing, is that this portion of the disputed phrase does not render the phrase indefinite; but rather, "one or more potential users" is the portion that is indefinite. Thus, the Court does not focus on "visually perceptible location" herein and constrains its analysis to the disputed phrase "one or more potential users."

the disputed phrase is objective because it recites that potential users are users that may gain access to a centralized access point to access selected content. Thus, potential users become actual users in the next step in Claim 16.

The specification is in accord. For example, the specification states that "[t]he system and method allow anyone to make a contribution by uploading web pages with graphics to be stored on Applicant's web site and system. The system and method then present the information to individuals who potentially desire such information." '177 Patent at 7:57-61. Similarly, the specification states that "[t]he system and method uses distributed information access points to more effectively reach a world-wide user community. User convenience is increased by providing a greater number of access points to information that is demo-graphically selected to be more highly desired by users at that particular distribution point." '177 Patent at 7:62-67. As further indicated by the specification, this "enables a user to submit a purchase request to a third-party web site in order to buy content such as a featured printer which is displayed within box 160." '177 Patent at 19:16-19; *see also*, '177 Patent at 38:54-59 ("By displaying the size of the waitlist via user waitlist number display 390 within the screen display of FIG. 30, user demand is plainly made visible to a potential contributor, as well as to other potential users.").

As the specification indicates, the ability to access computer network software does not depend on subjective opinion. *See Gonzalez v. Infostream Group, Inc.*, Case No. 2:14-cv-906-JRG-RSP, 2015 U.S. Dist. LEXIS 125387, at *50 (E.D. Tex. Sept. 21, 2015) (concluding that the "effective use" of website label data was not a subjective term). Indeed, the specification states that "[p]ersonal web pages on Applicant's web site provide a system and method that allows *any individual user* within the world-wide user community to select information from *any distributed*

*stand-alone access point* that is capable of being accessed within a network system." '177 Patent at 7:19-23 (emphasis added).

The Court is further guided by a recent Memorandum Opinion and Order in the *Intellectual Ventures II LLC v BITCO Gen. Ins. Corp*. case wherein the Court held that the phase "centralized access point of the particular user" in Claim 16 is not indefinite, and that "particular user" merely describes one of the "one or more potential users." *See Intellectual Ventures II LLC v. Bitco General Insurance Corporation*, 6:15-CV-59, Docke No. 116.  Accordingly, the term "presenting one or more distributed information access points to one or more potential users at a visually perceptible location" is not indefinite and should be given its plain and ordinary meaning.

### IV.   *Disputed Term in the '298 Patent*

The '298 Patent, titled "Method and Apparatus for Identifying and Characterizing Errant Electronic Files," was filed on June 3, 2005, and issued on July 13, 2010.  The Abstract states:

> A computer system includes a, server having a memory connected thereto. The server is adapted to be connected to a network to permit remote storage and retrieval of data files from the memory. A file identification application is operative with the server to identify errant files stored in the memory. The file identification application provides the functions of: (1) selecting a file stored in said memory; (2) generating a unique checksum corresponding to the stored file; (3) comparing said unique checksum to each of a plurality of previously generated checksums, wherein the plurality of previously generated checksums correspond to known errant files; and (4) marking the file for deletion from the memory if the unique checksum matches one of the plurality of previously generated checksums.

### a. "selecting the file based on whether content of the file matches a file type indicated by a name of the file" (Claims 1, 10, and 16)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | Selecting the file based on whether the content of the file matches a file type indicated by the filename extension of the file. |

As a preliminary matter, HCC states in a footnote that it "does not believe that this dispute has a material bearing on any validity or infringement issues but seeks to clarify the plain and ordinary meaning of the term, which is how it is used in the patent."  Docket No. 78 at 12 n.4.  Notwithstanding, HCC argues for four pages whether the recited "by a name of the file" should be redrafted as "by the filename extension of the file."  In response, IV argues that neither the claim language nor the specification limit "a name of the file" to a "filename extension of the file."

There is no reason to limit the "name of a file" to only one part of the filename—the file extension.  Docket No. 79 at 3.  IV argues that HCC takes an embodiments-first approach by arguing that "in the context of the '298 Patent, the 'filename extension' is the portion of the file name that 'indicates' the type of file at issue."  Docket No. 79 at 3 (citing Docket No. 78 at 8).  IV contends that HCC does not point to lexicography or disavowal.  According to IV, the plain meaning of a file name—which would include the portions before and after the "."—controls.  *Id.* (citing *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1349–53 (Fed. Cir. 2011) (construing the term "bus" to cover both multiplexed busses and non-multiplexed busses, even though the specification only disclosed multiplex buses)).

Claims 1, 10, and 16 state "selecting the file based on whether content of the file matches a file type indicated by a name of the file; or . . . . " '298 Patent at Claims 1, 10, and 16.  The claim itself recites "name of the file" —not file extension.  Furthermore, the specification does not contain HCC's limitations, but instead states that "the file names may include an embedded numerical designation such as 'xxx00l.jpg' or 'xxx002.jpg'." *Id.* at 5:9-11.  As indicated, the "name of the file" includes both the prefix and the suffix, and is not limited to the file extension.  Accordingly, having resolved the Parties' claim construction dispute, the term "selecting the file

based on whether content of the file matches a file type indicated by a name of the file" should be given its plain and ordinary meaning.

## V.   *Disputed Terms in the '752 Patent*

The '752 Patent, titled "Network System Extensible by Users," was filed on November 24, 2004, and issued on May 24, 2011.  The Abstract states:

> In one aspect, a network system includes a user interface which allows a user to interact with the network system. An agent server is coupled to the user interface. The agent server manages the operation of the network system. Furthermore, the agent server in conjunction with the user interface is operable to create or modify an agent in response to interaction by the user. In another aspect, a network system includes an agent server which manages the operation of the network system. An agent is operable to utilize a service within the network system. A service wrapper, associated with the service, cooperates with the agent server to mediate interaction between the service and the agent.

### a. "agent" (Claims 1, 7, 9, and 24)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | "a process that occupies a place and that is mobile, *i.e.,* can move from a first place to a second place" |

The Parties dispute whether "agent" should be construed, and, if so, whether the term should be construed in accordance with a glossary appearing in a patent that was incorporated by reference.  HCC argues that the '752 Patent incorporates by reference a "GLOSSARY OF TERMS" that defines "agent" as "a process that occupies a place and that is mobile, i.e., can move from a first place to a second place."  Docket No. 78 at 25 (citing '752 Patent at 1:30-52, 5:27-31; U.S. Patent No. 5,603,031 ("'031 Patent") at 16:60, 65-67 (Docket No. 78-8)).  HCC argues that when a definition is provided in the intrinsic evidence of a patent, the presumption is that such a definition is controlling for the meaning of that term.  *Id.* at 27.

IV replies that the '752 Patent discloses that the agent *may* be mobile, which indicates that it does not have to be mobile.  Docket No. 79 at 7 (citing '752 Patent at 14:10–14 ("In one

embodiment, agents 22 may travel throughout the environment of computer based system 30. That is, each agent 22 may move to the servers and other computers . . ..")).  IV argues that the use of the word "may" and "in one embodiment" indicates that the agent may or may not be mobile.  *Id*. at 8.  IV also argues that the '752 Patent expressly identifies the '031 Patent as "an exemplary construction for an agent system."  *Id*. ('752 Patent at 5:27–31).  IV contends that an exemplary construction for an agent system, in which the agent is mobile, does not limit the claims to only that example system.

The '752 Patent expressly states "[a]n exemplary construction for an agent system is taught by U.S. Pat. No. 5,603,031, issued to the Assignee of the present invention, the text of which is incorporated herein by reference."  '752 Patent at 5:27-31.  The use of the phrase "an exemplary construction for an agent system" does not override the patentee's expressed and particular incorporation by reference of the definition of "agent."  "Incorporation by reference occurs when the referencing patent makes it 'apparent that the cited document is part of the referencing document as ... [if] it were fully set out therein.'"  *Alt v. Medtronic, Inc*., No. 2:04-CV-370, 2005 WL 6225306, at *9 (E.D. Tex. Nov. 30, 2005) (quoting *In re Lund*, 376 F.2d 982, 989 (CCPA 1967)).  Furthermore, "[t]o incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents."  *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2002) (citing *In re Seversky,* 474 F.2d 671, 674 (CCPA 1973) (providing that incorporation by reference requires a statement "clearly identifying the subject matter which is incorporated and where it is to be found")); *see also Cook Biotech Inc. v. Acell, Inc.,* 460 F.3d 1365, 1375–77 (Fed. Cir. 2006) (explaining that when a patent expressly incorporates by reference another patent – which contains an express definition

of a term – such an incorporation includes the definition of the disputed term into the patent which is incorporating by reference).

The language of the incorporation statement is clear in this case.  Specifically, the '752 Patent indicates that the patentees clearly intended to incorporate the definition of an "agent" provided in the '031 Patent.  The '752 Patent expressly states "an agent system is taught by . . . [the '031 Patent] . . . the text of which is incorporated herein by reference." '752 Patent at 5:27-31.  The '031 Patent's glossary of terms clearly defines "agent" as "a process that occupies a place and that is mobile, i.e., can move from a first place to a second place," such a definition is controlling.  Docket No. 78-8 at 117 ('031 Patent at 16:65-67).  Moreover, the use of "may" is not inconsistent with such a finding.  Accordingly, the Court construes the term "agent" as it is defined in the '031 Patent, "a process that occupies a place and that is mobile, *i.e.,* can move from a first place to a second place."

**b. "service resource" (Claims 1, 7, 9, and 24)**

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | This term is indefinite. |

The Parties dispute whether the term is indefinite.  HCC contends that the patent provides no guidance on how to determine with reasonable certainty whether a particular resource is a service resource, a computational resource, both, or neither.  Docket No. 78 at 30.  Specifically, HCC argues that the '752 Patent is inconsistent in its descriptions of service resources and computational resources.  *Id.*  HCC contends that Figure 1 shows a box for Computational Resources 21 and four boxes for Service Resources 25, with none of the boxes overlapping.  *Id.* HCC argues that the '752 Patent provides "memory storage space" as an example of both a "service resource" and a "computational resource." *Id.* (citing '752 Patent at 8:19-20, 24:34-37).

HCC further contends that the '752 Patent provides "disk space" as an example of a service resource, but does not indicate that such is a computational resource. *Id.* (citing '752 Patent at 11:2-5). HCC argues that "long-distance time" and "on-line data access time" are service resources, while "processing time" and "elapsed time" are computational resources. *Id.* at 30-31. Thus, according to HCC, the patent does not provide an explanation why certain "times" are services resources, while other "times" are computational resources. *Id.* at 31.

IV argues that the '752 Patent gives both general and specific examples of "service resources." Docket No. 75 at 27. IV contends that the '752 Patent generally equates a service resource to "a resource which enables a service to be performed," and that the '752 Patent goes into detail as to what comprises service resources. *Id.* at 21, 27 (citing '752 Patent at 10:61–11:5). IV also contends that the '752 Patent explains what "computational resources" may include, and provides examples of the computational resources. *Id.* at 28 (citing '752 Patent at 8:15–21). IV argues that HCC provides no authority that different claim limitations cannot refer to overlapping subject matter. Docket No. 79 at 9 (citing *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) ("We therefore do not agree with the district court that the use of the two different terms in the asserted claims tends to support the conclusion that the two terms cannot be synonyms for one another.")). According to IV, "service resources" may be the same matter as "computational resources." *Id.*

HCC has not met its burden of proving "service resource" is indefinite given that the specification provides both examples and a general definition for the recited "service resource." Specifically, the specification describes "service resources" separately from "computational resources," but also indicates that there may be some overlap between the two. Furthermore, none of the asserted claims include both a "computational resource" and a "service resource,"

thus there is not an issue with being able to distinguish the resources in an asserted claim. Instead, "computational resource" only appears in dependent claims 17 and 18.  In sum, the specification indicates that a person of ordinary skill in the art would understand that a "service resource" and "computational resource" do not have to be separate.  Accordingly, the term "service resource" is not indefinite, and construes the term to mean "a resource which enables a service to be performed."

### c. "a URL defining a type of event and identifying the network-based agent" / "a URL defining a type of the predetermined event and identifying the network-based agent" (Claims 1, 7, 9, and 24)

| IV's Proposed Construction | HCC's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning.  No construction necessary. | Address of a webpage that includes a type of (the predetermined) event and the network based agent that is the (predetermined) event's intended recipient. |

The Parties dispute: (1) whether the phrases require construction; (2) whether a URL is an address of a web page; and (3) whether the network-based agent identified by the URL is the intended recipient of the event defined by the URL.  HCC contends that the plain and ordinary meaning of a URL is the address of a webpage.  Docket No. 78 at 31 (citing '752 Patent at 18:29-31).  HCC further argues that the "one embodiment" disclosed in the specification is the only claimed embodiment, and that the '752 Patent provides no guidance on how other definitions of the term URL, such as file transfer ("ftp"), email ("mailto"), or databases ("JDBC"), could be used to provide the claimed functionality.  *Id.*  HCC also argues that the '752 Patent requires the URL to define "a type of event" and identify "the network-based agent." *Id.* at 32 (citing '752 Patent at 18:31-32).  Thus, HCC contends that its construction is the only plausible construction because it includes such limitations.

IV argues that HCC's embodiment-first approach is contrary to black-letter law.  Docket No. 79 at 10 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (a sole embodiment should not be read into claims absent a clear intention to limit the claim scope)).  IV further argues that HCC provides no justification for replacing the claim language, "defining" and "identifying," with the word "includes," which narrows the claim scope.  According to IV, nothing in the claim language requires that the URL "include" the "network-based agent," but instead the claim language only requires identification.

The claimed URL refers to a "universal resource locator," and a "resource" is broader than a web page.  '752 Patent at 18:29-31.  While the specification does not explicitly state that the URL is broader than just a website, it is common knowledge that a URL can include ftp, mailto, and/or databases.  Indeed, HCC's counsel agreed that a URL is an address of something on the Internet.  Tr. at 66:8-9.  Thus, the replacement of the term "URL" with HCC's suggested "address of a webpage" would improperly limit the claims to a disclosed embodiment.  HCC has failed to provide a persuasive reason for replacing the claim language "defining" and "identifying" with the narrower word "includes."   Accordingly, having resolved the Parties' claim construction dispute, the term "a URL defining a type of event and identifying the network-based agent" / "a URL defining a type of the predetermined event and identifying the network-based agent" should be given its plain and ordinary meaning.

### d. "consumed" (Claims 1, 7, 9 and 24)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | "used up" |

The Parties dispute whether the term "consumed" should be construed at all, and, if so, whether it means "used up."  HCC points to one sentence in the '752 Patent that states "[a]s

described herein, computational resources 21 may be 'consumed' or 'used up' during the operation of network system 2."  Docket No. 78 at 29 (citing '752 Patent at 8:21-23).  HCC argues that this sentence defines "consumed," and that the definition is commensurate with the ordinary use of the term.  *Id.*  HCC also contends that the '752 Patent's use of the more general phrase "consumed or used" does not alter this definition because when a resource is "used up," it is of necessity also "used."  *Id.*

IV argues, to the contrary, that the '752 Patent repeatedly discloses that "consumed" is commensurate with its plain and ordinary meaning, which is "used."  Docket No. 75 at 26 (citing '752 Patent at 9:31-36, 9:40-43, 14:17-20; 16:51-55, 25:14-16).  IV contends that HCC is "latch[ing] onto one disjunctive phrase in support of their construction . . .  [b]ut the specification does not equate 'consumed' to 'used up' [instead] the bulk of the specification . . . indicates that 'consumed' is akin to 'used.'"  *Id.*

HCC's citation to one sentence in the '752 Patent specification that defines "consumed" as "used up," is not enough to support its proposed construction.  The intrinsic evidence indicates that the term "consumed" is synonymous with "used."  The specification repeatedly states that the agent use or consume the resources, or that the resources may be used or consumed. *See* '752 Patent at 9:31–36 ("[A]gents 22 may use or consume various computational resources 21 . . . . Furthermore, agents 22 may also use or consume various service resources . . . ."); *id.* at 9:40–43 ("[E]ach agent 22 is given permission to consume up to a pre-authorized amount of each computational resource and each service resource that the agent may use when performing its respective task(s)."); *id.* at 14:17–20 ("computational resources 21 which may be expended, consumed, or used during the operation"); *id.* at 16:51–55 ("monitor the amount of respective service resources 25 expended, used, or otherwise consumed by one or more agents 22 which

have been authorized to access the service 24"); *id.* at 25:14–16 ("service wrapper 26 identifies the amount of each service resource 25 actually consumed or used to execute the instruction."). Accordingly, the Court construes the term "consumed" to mean "used."

### e. "exhausted" (Claims 1, 7, 9, and 24)

| IV's Proposed Construction | HCC's Proposed Construction |
|---|---|
| Reaching an allocated amount. | "used up completely such that the resource is no longer available for reuse" |

The Parties dispute whether the term "exhausted" should be construed consistent with the specification, as IV proposes, or consistent with a statement that the patentee made during prosecution, as HCC proposes.  HCC argues that the file history for the '752 Patent could not be more clear as to the meaning of "exhausted."  Docket No. 78 at 32.  HCC contends that during prosecution the patentee argued that a resource that can be reused is "the exact opposite" of a resource that is "exhausted upon being consumed."  *Id.* at 33 (citing Docket No. 75-3 at 14).  The examiner rejected the patentee's argument, which indicates that the examiner believed that the '752 Patent taught and claimed a broader disclosure.  Docket No. 75-4 at 3 (2010-11-08 Final Rejection) ("In the applicant's invention, resources are reused . . .. While these resources may be at full capacity at any given time, the [sic] can always be reused later when they are not at full capacity.").

HCC argues that the issue is not whether the patent examiner disagreed with the statement, but whether the patentee withdrew the statement.  Docket No. 78 at 33.  HCC contends that there is no indication in the file history that the patentee ever disagreed that exhausted is "the exact opposite" of reusable.  *Id.*  HCC argues that the patentee simply amended the claims in another way, "[w]ithout acquiescing to the propriety of the rejection."  *Id.* (citing (Docket No. 75-5 at 11); *3M Innovative Properties Co. v. Tredegar Corp.,* 725 F.3d 1315, 1332

(Fed. Cir. 2013) ("we are guided by legal principles dictating that we rest on the statements made by the patentee over conflicting statements of an examiner because it is the patentee's words that define the claim")).

IV argues that after the examiner rebutted the patentee's characterization of "exhausted," the patentee did not continue to argue that "exhaustion" is commensurate with lack of resource "reuse."  Docket No. 75 at 31.  Instead, the patentee amended claims to add a different limitation (relating to the use of an URL) that the examiner indicated would be allowable subject matter. *Id.* (citing Docket No. 75-5 at 11-12).  IV notes that the examiner then allowed the claims.  *Id.* IV contends that "[b]ecause the patentee did not continue to proffer its earlier argument regarding the scope of 'exhausted' after the examiner rejected it, there is no clear and unmistakable disclaimer of claim scope."  *Id.* (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342-44 (Fed. Cir. 2009) (finding no disavowal of claim scope when examiner rejected patentee's allegedly limiting arguments and then patentee abandoned those arguments); *NovelPoint Learning LLC v. Leapfrog Enters.*, 2010 U.S. Dist. LEXIS 24706, at *21 (E.D. Tex. Feb. 27, 2012) (same)).  According to IV, one of ordinary skill in the art reviewing the '752 Patent and its file history would understand that the claims are not limited to resources that cannot be reused after they reach their maximum capacity because the file history does not contain unmistakable disclaimer.  Docket No. 75 at 31.

As a preliminary matter, the Parties dispute whether *Ecolab* is distinguishable from this case.  In *Ecolab*, the Federal Circuit held that "[e]ven if an isolated statement appears to disclaim subject matter, the prosecution history as a whole may demonstrate that the patentee committed no clear and unmistakable disclaimer."  *Ecolab*, 569 F.3d at 1342.  IV contends that *Ecolab* should guide the Court's analysis herein.  HCC argues that *Ecolab* is distinguishable from the

current case because the applicant in *Ecolab* "sought to overcome prior art by arguing that the claimed invention included only a single antimicrobial agent ... [b]ut the claim used the phrase 'consisting essential of,' which legally meant that the claim was not limited to only a single antimicrobial agent but rather was 'open to unlisted ingredients.'"  Thus, the examiner in *EcoLab* was correcting the applicant's legally incorrect remarks, whereas here, the examiner was not correcting a legally incorrect argument but rather merely disagree with the patentee's argument.

While the facts in *EcoLab* may be distinguishable from the current case, its holding is nevertheless instructive.  The prosecution history, when considered as a whole, demonstrates that the patentee did not make a clear and unmistakable disclaimer.  Thus, the term should be construed consistent with the specification.  The specification states, "the present invention protects the subscribers and a service provider from misuse or overuse, whether intentional or inadvertent, of such resources" '752 Patent at 44-47.  The specification further states, "service wrapper 26 actively monitors service resource consumption and halts further consumption whenever the amount held by an agent 22 is exhausted."  *Id.* at 52:31-34.  In further describing the term, the specification states, "each agent 22 is given permission to consume up to a pre-authorized amount of each computational resource and each service resource that the agent may use when performing its respective task(s)."  *Id.* at 9:40-43.

Similarly, the specification states, "a computational or a service permission may be associated with a particular principal and specifies a predetermined amount of a respective resource which is allowed to be consumed on behalf of that principal."  *Id.* at 9:52-55.  Likewise, the specification states that an "[a]gent server 20 and service wrappers 26 cooperate in order to ensure that an agent 22 does not consume more than its allotted amount of any particular service resource 25 as specified by a respective service permission 64."  *Id.* at 22:34-37, *see also id.* at

22:47-50; *id.* at 24:63-67, *id.* at 25:1-6.  A person of ordinary skill in the art would understand that "exhausted" means "used up to the allotted or pre-determined amount."  Accordingly, the Court construes the term "exhausted" to mean "used up to the allotted or pre-determined amount."

## CONCLUSION

For the foregoing reasons, the Court hereby **RECOMMENDS** the claim constructions set forth above.  For ease of reference, the Court's recommended constructions are stated in a table in Appendix A.

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b).

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Assn.*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 26th day of August, 2016.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

**Appendix A**

| Claim Term | Court's Construction |
|---|---|
| '442 "error correction" | "reconstruction of erroneous data" |
| '442 "error correction code" | "code that can be used to correct erroneous data" |
| '442 "packet" | "a basic unit of transport over a channel that includes data, control information, and error correction code" |
| '442 "transaction controller" | "a system-serialization point through which all transactions pass" |
| '442 "microprocessor interface" | Plain and ordinary meaning |
| '442 "memory interface" | Plain and ordinary meaning |
| '442 "switch interface" | Plain and ordinary meaning |
| '442 "in the interfaces" | "in the microprocessor interfaces, in the switch interfaces, and in the memory interfaces" |
| '177 "presenting one or more distributed information access points to one or more potential users at a visually perceptible location" | Plain and ordinary meaning |
| '177 "administrative interface" | "a software management tool that facilitates administrative functions" |
| '177 "centralized access point of a user" | "a user's network resource that can be used to access content" |
| '177 "centralized access point of the particular user" | "the particular user's network resource that can be used to access content" |
| '177 "distributed information access point" | "a network resource which is delivered to one or more users and that enables a user to interact with a centralized access point" |
| '298 "selecting the file based on whether content of the file matches a file type indicated by a name of the file" | Plain and ordinary meaning |
| '298 "identification value" | "a value used to identify a file" |
| '298 "checksum" | "a unique number based upon a range or ranges of bytes in a file, but not related to the total number of bytes used to generate the number" |
| '752 "agent" | "a process that occupies a place and that is mobile, *i.e.*, can move from a first place to a second place" |
| '752 "service resource" | "a resource which enables a service to be performed" |
| '752 "a URL defining a type of event and identifying the network-based agent" / "a URL defining a type of the predetermined event and | Plain and ordinary meaning |

| identifying the network-based agent" | |
|---|---|
| '752 "consumed" | "used" |
| '752 "exhausted" | "used up to the allotted or pre-determined amount" |
| '752 "means for receiving data for creating a network based agent" | Function: receiving data for creating a network based agent<br><br>Structure: communication line 68 |
| '752 "means for invoking, in response to receiving a URL defining a type of event and identifying the network-based agent, an execution of the network-based agent" | Function: invoking, in response to receiving a URL defining a type of event and identifying the network-based agent, an execution of the network-based agent<br><br>Structure: agent server 20 |
| '752 "means, including the network-based agent, for using a service and a service resource configured to be consumed by the network-based agent for performing the operation, wherein an amount of the service resource is exhausted upon being consumed by the network-based agent" | Function: using a service and a service resource configured to be consume by the network-based agent for performing the operation, wherein an amount of the service resource is exhausted upon being consumed by the network-based agent<br><br>Structure: agent 22 |
| '752 "means for communicating a result of the operation over a network communications link" | Function: communicating a result of the operation over a network communications link<br><br>Structure: communication line 68 |
| '752 "means for allowing a user to modify the network-based agent" | Function: allowing a user to modify the network-based agent<br><br>Structure: network system 2 |